## THE QUEVILLY.

(District Court, E. D. Pennsylvania. June 12, 1899.)

1. CONTRACTS—COERCION—THREAT OF LEGAL PROCEEDINGS.
    A declaration by the agent of a tug company that he would commence legal proceedings against a foreign vessel, unless a charge made for towage was acceded to and approved by the captain, does not constitute coercion.

2. TOWAGE—CONTRACT—TONNAGE OF VESSEL.
    The amount due for the towage of a French vessel in and out of port depended, under the contract, on the tonnage of the vessel. Her French papers gave the net tonnage as 1,709 tons; but the United States customs authorities refused to accept such measurement, and had her remeasured, which gave her a net tonnage of 3,106 tons. No proof of the method by which she was measured in France was given, but it appeared from her carrying capacity and gross tonnage that the net tonnage stated in her papers could not have been reached by any rule of ordinary maritime measurement. *Held*, that the measurement made here would be accepted as correct, and governed the contract for towage.

In Admiralty. This was a suit to recover for towage.

Curtis Tilton, for libelant.
Horace L. Cheyney and John F. Lewis, for respondent.

McPHERSON, District Judge. This is a controversy concerning the amount due for the inward and outward towage of the French bark Quevilly between the sea and the port of Philadelphia, both sums being in dispute. The services were rendered in August, 1897, upon the occasion of the bark's first voyage to this port. She was a new, four-masted, steel bark, built to carry petroleum, and was coming to America in ballast. As she approached the capes, the tug Protector offered to tow her from the Delaware breakwater to the city. The owners of the tug belong to the Tugboat Owners' Association of Philadelphia, whose members have agreed to charge certain rates for towage, based upon the net registered tonnage of the vessel to which such service is rendered. The master of the Protector in-

formed the captain of the bark that he would charge these rates, and was told by the captain that her net registered tonnage was 1,709 tons. The master of the tug refused to accept this statement, saying that the bark looked twice as large, and more or less dispute followed upon this point. Finally, as the captain of the bark insisted that the net registered tonnage of his vessel was no more than 1,709 tons, the tug agreed to tow her to Philadelphia upon that basis, but with the further agreement that, if she should be found to be larger, the price to be paid should be correspondingly increased. After the vessel reached Philadelphia, the captain of the bark approved a bill for towage amounting to $122, this being the agreed rate upon the basis of 1,709 tons. The United States customs authorities refused to accept the vessel at this tonnage, and she was thereupon measured by the government officials according to the rules prescribed by the Revised Statutes, and was found to have a net registered tonnage of 3,106 tons. When this fact became known to the agent of the tug, he insisted upon being paid at that rate; and after some further contention the captain of the bark approved a bill for $220 based upon the customs measurement, stating expressly that the second bill annulled the first. The second bill was not given under coercion. It is no doubt true that the agent of the tug threatened that, if settlement were not made, he would attach the vessel, and have the dispute settled by the proper tribunal; and it may be also true that the captain of the bark considers this threat to be "oppression." He so testified, but clearly it had no such legal effect. If the parties could not agree, the dispute could only be properly adjusted by a suit. There was nothing coercive in the declaration that this method of settlement would be resorted to. So far as the inward towage is concerned, therefore, we find as a fact that the contract asserted by the libelant was made, and that the sum of $220 is due upon this account. The contract for outward towage was made by the agent of the tug with Mr. Lepitet, the agent of the bark; and, although there is a conflict in the testimony concerning the terms of the agreement, we have little hesitation in finding that the service was to be paid for upon a tonnage of 3,106 tons,—the price amounting to $368. The captain of the bark approved a bill for this sum, adding a clause,—which, under the facts hereafter stated, is of no importance,—"under reserve of the French measurement." After the bark reached the breakwater, the captain agreed to pay a further sum of $30 for towage to the Five Fathom Bank, and this amount is conceded to be due.

It seems to us that little discussion is needed. It is true that the net registered tonnage of the bark, according to her French papers, was 1,709 tons, but the method by which this result was reached was not proved; and it is clear that it must have been reached by applying some method of measurement not in use here, or in general use anywhere. The bark has a carrying capacity of 3,800 tons. She has a gross tonnage of 3,481.52 tons, and, according to her ship's papers, from this is to be deducted, for "machines and other deductions, * * * 1,771.92" tons, leaving only 1,709.60 tons as her net registered tonnage. No explanation was offered of this unusual result;

but, as the tonnage of 3,481 tons is said to be "special for the settlement of the prime (premium) according to the law of January 30, 1893," it is at least possible that the explanation may be found in the terms of that law. What these terms are, we are not informed. They may perhaps fix one rule of measurement in order to calculate a bounty to be paid, while another rule may be used when the purpose is to calculate capacity according to the ordinary maritime measurement. However this may be, the testimony before us establishes the fact that no rule of maritime measurement in ordinary use could produce the net tonnage contended for by the respondent. We therefore conclude that a proper measurement of the vessel was made by the customs authorities, and that her true net tonnage is 3,106 tons. Upon this tonnage the tug was entitled to charge, under the terms of the two contracts in proof. The libelant is therefore entitled to a decree for $618, with interest from August 18, 1897, and costs.